UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| MARINA BICHOFFE, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>YOUNG CONSULTING, LLC,<br><br>    Defendant. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Marina Bichoffe ("Plaintiff"), individually and on behalf of all other similarly situated individuals (the "Class Members," as defined below), by and through counsel, file this Class Action Complaint against Young Consulting, LLC ("Young Consulting" or "Defendant") and allege the following based on personal knowledge of facts pertaining to her and on information and belief based on the investigation of counsel as to all other matters.

## I.    NATURE OF THE ACTION

1.    Young Consulting provides software solutions for the marketing, underwriting, and administration of medical stop loss insurance.

2.    Young Consulting provides risk management services to Blue Shield of California and, in that capacity, receives the personal information of Blue Shield of California customers.

3.     Plaintiff and the Class Members (as further defined below) have had their personal identifiable information exposed as a result of Young Consulting's inadequately secured computer network.  Defendant betrayed the trust of Plaintiff and the other Class Members by failing to properly safeguard and protect their personal identifiable information and thereby enabling cybercriminals to steal such valuable and sensitive information.

4.     This class action seeks to redress Young Consulting's unlawful, willful and wanton failure to protect the personal identifiable information of approximately 954,177 individuals that was exposed in a major data breach impacting Defendant's network (the "Data Breach" or "Breach").[1] The Data Breach was discovered on April 13, 2024, when Young Consulting became aware of suspicious activity on its systems. Based on a subsequent forensic investigation, Young Consulting determined that cybercriminals infiltrated its inadequately secured computer systems and thereby gained access to its network from April 10, 2024 through April 13, 2024. The investigation further determined that, through this infiltration, cybercriminals potentially accessed and acquired files containing the sensitive personal information of Plaintiff and the Class Members.[2]

---

[1]    *See*    https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/9cb5e8fe-3d04-48e5-a403-d478cdaf5c7f.html.

[2] *Id.*

5.      According to Young Consulting, the personal identifiable information exposed in the Breach included, but is not limited to, names, Social Security numbers, dates of birth, and insurance claim information (the "Private Information").[3]

6.      For the rest of their lives, Plaintiff and the Class Members will have to deal with the danger of identity thieves possessing and misusing their Private Information. Plaintiff and Class Members will have to spend time responding to the Breach and are at an immediate, imminent, and heightened risk of all manners of identity theft as a direct and proximate result of the Data Breach. Plaintiff and Class Members have incurred and will continue to incur damages in the form of, among other things, lost time and expenses mitigating harms, increased risk of harm, damaged credit, deprivation of the value of their Private Information, loss of privacy, and/or additional damages as described below.

7.      Plaintiff brings this action individually and on behalf of the Class, seeking remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, injunctive relief, reasonable attorney fees and costs, and all other remedies this Court deems proper.

---

[3] *Id.*

## II.    THE PARTIES

**<u>Plaintiff</u>**

8.      Plaintiff is domiciled in Washington, D.C.

9.      On or around August 26, 2024, Plaintiff received a breach notification letter from Young Consulting informing her that her Private Information, including her name, Social Security number, date of birth, and insurance claim information had been exposed to cybercriminals during the Data Breach.

**<u>Defendant</u>**

10.      Defendant Young Consulting is a Georgia limited liability company with its principal place of business located at 1 E Wacker Drive, STE 2900, Chicago, IL, 60610. Upon information and belief, Defendant is comprised of members who are either Georgia resident citizens or corporations.[4]

11.      Young Consulting can be served through its registered agent, CT Corporation System, located at 289 South Culver Street, Lawrenceville, GA, 30046.

12.      Young Consulting provides software solutions for the marketing, underwriting, and administration of medical stop loss insurance.

## III.    JURISDICTION AND VENUE

13.      This Court has diversity jurisdiction over this action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), because this is a class action

---

[4] *See* https://www.youngconsulting.com/contact/.

involving more than 100 class members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and many members of the class are citizens of states different from Defendant.

14.    Defendant was organized under the laws of Georgia.

15.    Upon information and belief, at least one member of the proposed class is diverse from at least one member of Defendant.

16.    This Court has personal jurisdiction over Defendant because it is organized in the State of Georgia, regularly transacts business in this District, had its principal office located in Georgia until earlier this year, and sent out data breach notification letters listing an address in Georgia: 3200 Windy Hill Road SE, Suite 1400W, Atlanta, GA 30339.[5] Venue is likewise proper as to Defendant in this District because a substantial part of the events or omissions giving rise to the claim occurred in this District. 28 U.S.C. § 1391(b)(2).

## IV.    FACTUAL ALLEGATIONS

### A.    The Data Breach

17.    Based on information supplied by Defendant, the Data Breach was discovered on April 13, 2024, when Young Consulting became aware of suspicious activity on its systems. Based on a subsequent forensic investigation, Young

---

[5]    *See* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/9cb5e8fe-3d04-48e5-a403-d478cdaf5c7f.html.

Consulting determined that cybercriminals infiltrated its inadequately secured computer systems and thereby gained access to its network from April 10, 2024 through April 13, 2024. The investigation further determined that, through this infiltration, cybercriminals potentially "downloaded copies" of files containing the sensitive personal information of Plaintiff and the Class Members.[6]

18.    According to Young Consulting, the Private Information exposed in the Breach included, but is not limited to, names, Social Security numbers, dates of birth, and insurance claim information.[7]

19.    Defendant failed to take the necessary precautions required to safeguard and protect Plaintiff's and the other Class Members' Private Information from unauthorized disclosure.

20.    Defendant also failed to provide timely notice to Plaintiff and Class Members.

21.    Defendant's actions represent a flagrant disregard of the rights of the Class Members, both as to privacy and property.

**B.    Plaintiff's Experience**

22.    On or around August 26, 2024, Plaintiff received a breach notification letter from Young Consulting informing her that her Private Information, including

---

[6] *Id.*

[7] *Id.*

her Social Security Number, had been exposed to cybercriminals during the Data Breach.

23.    Because of the Data Breach, Plaintiff's Private Information is now in the hands of cyber criminals. Plaintiff and all Class Members are now imminently at risk of crippling future identity theft and fraud.

24.    As a result of the Data Breach, Plaintiff has already spent numerous hours responding to the Data Breach.  Among other things, Plaintiff has spent time researching the facts and scope of the Data Breach, monitoring her accounts and personal information, reviewing her financial statements, and taking other steps in an attempt to mitigate the adverse consequences of the Data Breach.  The letter Plaintiff received from Young Consulting specifically directed her to take these actions.[8]

25.    As a direct and proximate result of the Data Breach, Plaintiff will likely need to purchase a lifetime subscription for identity theft protection and credit monitoring.

26.    Plaintiff has been careful to protect and monitor her identity and personal information.

27.    Plaintiff has also suffered injury directly and proximately caused by the

---

[8] *See id*.

Data Breach, including: (a) theft of Plaintiff's valuable Private Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff's Private Information being placed in the hands of cyber criminals; (c) damages to and diminution in value of Plaintiff's Private Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (d) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff's Private Information; and (e) continued risk to Plaintiff's Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendant.

### C. Cyber Criminals Have Used and Will Continue to Use Plaintiff's Private Information to Defraud Them

28.    Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach can and will be used in a variety of sordid ways for criminals to exploit Plaintiff and the Class Members and to profit off their misfortune.

29.    Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[9] For example, with the Private Information stolen in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[10] These criminal activities have and will result in devastating financial and personal losses to Plaintiff and the Class Members.

30.    Social security numbers are particularly sensitive pieces of personal information.  As the Consumer Federation of America explains:

> **Social Security number.** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal

---

[9] "Facts + Statistics: Identity Theft and Cybercrime," Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

[10] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[11]

[Emphasis added.]

31.    Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it for years.[12]

32.    This was a financially motivated Breach, as the only reason the cyber criminals go through the trouble of running a targeted cyberattack against companies like Young Consulting is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein.  Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[13]  "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[14]

---

[11] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

[12] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/assets/270/262904.htmlu.

[13] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, Nov. 15, 2017, https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

[14] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

33.    These risks are both certainly impending and substantial. As the Federal Trade Commission ("FTC") has reported, if hackers get access to Private Information, they *will* use it.[15]

34.    Hackers may not use the information right away, but this does not mean it will not be used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information *may continue for years*. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[16]

35.    For instance, with a stolen social security number, which is part of the Private Information compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[17]

---

[15] Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

[16] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown,* GAO, July 5, 2007, https://www.gao.gov/assets/270/262904.htmlu.

[17] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

36.    The ramifications of Defendant's failure to keep its Class Members' Private Information secure are long lasting and severe. Once that information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

37.    Further, criminals often trade stolen Private Information on the "cyber black-market" for years following a breach. Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

38.    Approximately 21% of victims do not realize their identify has been compromised until more than two years after it has happened.[18] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[19]

39.    Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the

---

[18]    *See* Medical ID Theft Checklist, *available at:* https://www.identityforce.com/blog/medical-id-theft-checklist-2.

[19] Experian, *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages"), available at:* https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

future.[20]

40.    Defendant's offer of limited identity monitoring to Plaintiff and the Class is woefully inadequate and will not fully protect Plaintiff from the damages and harm caused by its failures. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. Once the offered coverage has expired, Plaintiff and Class Members will need to pay for their own identity theft protection and credit monitoring for the rest of their lives due to Young Consulting's gross negligence. Furthermore, identity monitoring only alerts someone to the fact that they have *already been the victim of identity theft* (*i.e.*, fraudulent acquisition and use of another person's Private Information)—it does not prevent identity theft.[21]  Nor can an identity monitoring service remove personal information from the dark web.[22] "The people who trade in stolen personal information [on the dark web] won't

---

[20] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013),    http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

[21] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, Nov. 30, 2017, https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html.

[22] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America, Mar. 19, 2019, https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

cooperate with an identity theft service or anyone else, so it's impossible to get the information removed, stop its sale, or prevent someone who buys it from using it."[23]

41.    As a direct and proximate result of the Data Breach, Plaintiff and the Class have had their Private Information exposed, have suffered harm as a result, and have been placed at an imminent, immediate, and continuing increased risk of further harm from fraud and identity theft. Plaintiff and the Class must now take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come. Even more seriously is the identity restoration that Plaintiff and other Class Members must go through, which can include spending countless hours filing police reports, following Federal Trade Commission checklists, and calling financial institutions to cancel fraudulent credit applications, to name just a few of the steps.

42.    Plaintiff and the Class have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including:

    a.    Trespass, damage to, and theft of their personal property including Private Information;

---

[23] *Id.*

b.    Improper disclosure of their Private Information;

c.    The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals and having been already misused;

d.    Loss of privacy suffered as a result of the Data Breach, including the harm of knowing cyber criminals have their Private Information and that identity thieves have already used that information to defraud other victims of the Data Breach;

e.    Ascertainable losses in the form of time taken to respond to identity theft and attempt to restore identity, including lost opportunities and lost wages from uncompensated time off from work;

f.    Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

g.    Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class members' personal information for which there is a well-established and quantifiable national and international market;

h.    The loss of use of and access to their credit, accounts, and/or funds;

i.    Damage to their credit due to fraudulent use of their Private Information; and

j.    Increased cost of borrowing, insurance, deposits, and the inability to secure more favorable interest rates because of a reduced credit score.

43.    The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous

sources cite dark web pricing for stolen identity credentials.[24] For example, Private Information can be sold at a price ranging from $40 to $200.[25] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[26]

44.     Moreover, Plaintiff and Class Members have an interest in ensuring that their information, which remains in the possession of Defendant, is protected from further breaches by the implementation of industry standard security measures and safeguards. Defendant has shown itself wholly incapable of protecting Plaintiff's Private Information.

45.     Plaintiff and Class Members also have an interest in ensuring that their personal information that was provided to Young Consulting is removed from Young Consulting's unencrypted files.

46.     Defendant acknowledged, in its letter to Plaintiff and other Class Members, that the Data Breach would cause inconvenience to affected individuals

---

[24] Your personal data is for sale on the dark web. Here's how much it costs, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[25] Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian, Dec. 6, 2017, available at: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[26] *In the Dark*, VPN Overview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous- browsing/in-the-dark/.

by providing numerous steps for Class Members to take in an attempt to mitigate the harm caused by the Data Breach.[27]

47.    In particular, the letter acknowledged that financial harm would likely occur, advising Class Members to "to remain vigilant against incidents of identity theft and fraud by reviewing your account statements, explanation of benefits, and monitoring free credit reports for suspicious activity and to detects errors.  Any suspicious activity should be reported to the appropriate insurance company, health care provider, or financial institution."[28]

48.    At Young Consulting's suggestion, Plaintiff is desperately trying to mitigate the damage that Young Consulting has caused her.  Given the kind of Private Information Young Consulting made accessible to hackers, however, Plaintiff is very likely to incur additional damages. Because identity thieves have her Private Information, Plaintiff and all Class Members will need to have identity theft monitoring protection for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the

---

[27]   *See*   https://apps.web.maine.gov/online/aeviewer/ME/40/1adfdecc-df2a-47a6-93bc-ef5a7ad1ac7a.shtml.

[28] *Id.*

loss of credit and employment difficulties that come with a new number.[29]

49.    None of this should have happened.

**D.    Defendant was Aware of the Risk of Cyber Attacks**

50.    Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some of the biggest cybersecurity breaches: Target,[30] Yahoo,[31] Marriott International,[32] Chipotle, Chili's, Arby's,[33] and others.[34]

---

[29] *Will a New Social Security Number Affect Your Credit?*, LEXINGTON LAW (Nov. 16, 2015), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html.

[30] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

[31] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html.

[32] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/.

[33] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b.

[34] *See, e.g.*, Taylor Armerding, *The 18 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Dec. 20, 2018), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

51.     Young Consulting should certainly have been aware, and indeed was aware, that it was at risk for a data breach that could expose the Private Information that it collected and maintained.

52.     Indeed, Young Consulting's Privacy Policy states:

> We maintain robust technological and organizational security measures to safeguard your personal information. These measures are designed to prevent accidental loss, unauthorized access, alteration, destruction, or disclosure of your data. Our policy ensures that only individuals with a legitimate business need have access to your personal information. Those handling your data adhere to Young Consulting's IT Information and Security rules, data protection guidelines, and other internal policies.[35]

53.     Young Consulting's assurance makes it evident that Young Consulting recognized it had a duty to use reasonable measures to protect the Private Information that it collected and maintained. Yet, it appears that Young Consulting did not meaningfully or comprehensively use the reasonable measures, including the measures it claims to utilize.

54.     Young Consulting was clearly aware of the risks it was taking and the harm that could result from inadequate data security.

---

[35] *See* https://www.Young Consultingtalent.com/privacy-policy/.

### E.    Young Consulting Could Have Prevented the Data Breach

55.    Data breaches are preventable.[36] As Lucy Thompson wrote in the DATA
BREACH AND ENCRYPTION HANDBOOK, "In almost all cases, the data breaches that
occurred could have been prevented by proper planning and the correct design and
implementation of appropriate security solutions."[37] She added that "[o]rganizations
that collect, use, store, and share sensitive personal data must accept responsibility
for protecting the information and ensuring that it is not compromised . . . ."[38]

56.    "Most of the reported data breaches are a result of lax security and the
failure to create or enforce appropriate security policies, rules, and procedures. . . .
Appropriate information security controls, including encryption, must be
implemented and enforced in a rigorous and disciplined manner so that a *data breach
never occurs*."[39]

57.    In a Data Breach like this, many failures laid the groundwork for the
Breach. The FTC has published guidelines that establish reasonable data security

---

[36] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are
Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed.,
2012).

[37]*Id.* at 17.

[38]*Id.* at 28.

[39]*Id.*

practices for businesses. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[40] The guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommended that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

58.    Upon information and belief, Young Consulting failed to maintain many reasonable and necessary industry standards necessary to prevent a data breach, including the FTC's guidelines. Upon information and belief, Young Consulting also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program

---

[40]    FTC, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

(FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS

CSC), which are well respected authorities in reasonable cybersecurity readiness.

59.    As explained by the Federal Bureau of Investigation, "[p]revention is

the most effective defense against ransomware and it is critical to take precautions

for protection."[41]

60.    To prevent and detect cyberattacks, including the cyberattack that

resulted in the Data Breach, Defendant could and should have implemented, as

recommended by the Federal Bureau of Investigation, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

---

[41] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[42]

---

[42] *Id.* at 3-4.

61.    Further, to prevent and detect cyberattacks, including the attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**.  Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**.  Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**.  If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**.  Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[43]

62.    In addition, to prevent and detect cyberattacks, including the cyberattack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**

  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audit; remove privileged credentials

- **Thoroughly investigate and remediate alerts**

  - Prioritize and treat commodity malware infections as potential full compromise;

- **Include IT Pros in security discussions**

  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

---

[43] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://us-cert.cisa.gov/ncas/tips/ST19-001.

- **Build credential hygiene**

  - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**

  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**

  - Use Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection
  - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[44]

63.    Given that Defendant was storing the Confidential Information of more than 900,000 individuals, Defendant could and should have implemented all of the above measures to prevent and detect malicious cyberattacks.

64.    Specifically, among other failures, Young Consulting had far too much confidential unencrypted information held on its systems.  Such Private Information

---

[44] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

26

should have been segregated into an encrypted system.[45]  Indeed, the United States Department of Health and Human Services' Office for Civil Rights urges the use of encryption of data containing sensitive personal information, stating "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[46]

65.     In sum, this Data Breach could have readily been prevented through the use of industry standard network segmentation and encryption of all confidential information. Further, the Data Breach could have likely been prevented had Defendant utilized appropriate malware prevention and detection technologies.

### F.     Defendant's Response to the Data Breach is Inadequate to Protect Plaintiff and the Class

66.     Defendant failed to inform Plaintiff and Class Members of the Data Breach in time for them to protect themselves from identity theft.

67.     Defendant stated that it discovered the Data Breach in April 2024. And yet, Young Consulting did not notify affected individuals until August 2024—*more than four months after it learned of the Data Breach*.  Even then, Young Consulting

---

[45] *See, e.g.,* Adnan Raja, *How to Safeguard Your Business Data with Encryption*, Aug. 14, 2018, https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.

[46]"Stolen Laptops Lead to Important HIPAA Settlements," U.S. Dep't of Health and Human Services (Apr. 22, 2014), available at https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

failed to inform Plaintiff and Class Members exactly what information was exposed in the Data Breach, leaving Plaintiff and Class Members unsure as to the scope of information that was compromised.

68.    During these intervals, the cybercriminals were exploiting the information while Young Consulting was secretly still investigating the Data Breach.

69.    If Young Consulting had investigated the Data Breach more diligently and reported it sooner, Plaintiff and the Class could have taken steps to protect themselves sooner and to mitigate the damages caused by the Breach.

## V.    CLASS ACTION ALLEGATIONS

70.    Plaintiff incorporates by reference all preceding paragraphs as if fully restated here.

71.    Plaintiff brings this action against Young Consulting on behalf of themselves and all other individuals similarly situated under Federal Rule of Civil Procedure 23. Plaintiff asserts all claims on behalf of a nationwide class (the "Class") defined as follows:

> All persons Young Consulting identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach.

72.    Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives,

successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff.

73.    Plaintiff reserves the right to amend the above definition or to propose subclasses in subsequent pleadings and motions for class certification.

74.    The proposed Class meets the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

75.    **Numerosity:** The proposed Class is so numerous that joinder of all members is impracticable. Defendant has reported that the total number of individuals affected in the Data Breach was 954,177 individuals.

76.    **Typicality:** Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class were injured through Young Consulting's uniform misconduct. The same event and conduct that gave rise to Plaintiff's claims are identical to those that give rise to the claims of every other Class member because Plaintiff and each member of the Class had their sensitive Private Information compromised in the same way by the same conduct of Young Consulting.

77.    **Adequacy:** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the Class; Plaintiff has retained counsel competent and highly experienced in data breach class action litigation; and Plaintiff and Plaintiff's counsel intend to prosecute this action

vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

78.    **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for members of the Class individually to effectively redress Young Consulting's wrongdoing. Even if Class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

79.    **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

        a.    Whether Defendant engaged in the wrongful conduct alleged herein;

b.    Whether Defendant failed to adequately safeguard Plaintiff's and the Class's Private Information;

c.    Whether Defendant owed a duty to Plaintiff and the Class to adequately protect their Private Information, and whether it breached this duty;

d.    Whether Young Consulting breached its duties to Plaintiff and the Class as a result of the Data Breach;

e.    Whether Young Consulting failed to provide adequate cyber security;

f.    Whether Young Consulting knew or should have known that its computer and network security systems were vulnerable to cyber attacks;

g.    Whether Young Consulting's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its company network;

h.    Whether Young Consulting was negligent in permitting unencrypted Private Information of vast numbers of individuals to be stored within its network;

i.    Whether Young Consulting was negligent in failing to adhere to reasonable retention policies, thereby greatly increasing the size of

the Data Breach to include former employees, applicants, and business associates;

j.     Whether Young Consulting failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and the Class;

k.     Whether Young Consulting continues to breach duties to Plaintiff and the Class;

l.     Whether Plaintiff and the Class suffered injury as a proximate result of Young Consulting's negligent actions or failures to act;

m.     Whether Plaintiff and the Class are entitled to recover damages, equitable relief, and other relief; and

n.     Whether Young Consulting's actions alleged herein constitute gross negligence, and whether Plaintiff and Class Members are entitled to punitive damages.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

80.    Plaintiff incorporates by reference all factual allegations in paragraphs 1-80 as though fully alleged here.

81.    Defendant Young Consulting solicited, gathered, and stored the Private Information of Plaintiff and the Class.

82.    Defendant had full knowledge of the sensitivity of the Private Information it maintained and of the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed. Defendant had a duty to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting that information. Plaintiff and the Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class Members had no ability to protect their Private Information that was in Young Consulting's possession. As such, a special relationship existed between Young Consulting and Plaintiff and the Class.

83.    Defendant was well aware of the fact that cyber criminals routinely target corporations, particularly those servicing the health industry, through cyberattacks in an attempt to steal the collected Private Information.

33

84.    Defendant owed Plaintiff and the Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining, storing, using, and managing personal information, including taking action to reasonably safeguard such data and providing notification to Plaintiff and the Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

85.    Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

86.    Defendant had duties to protect and safeguard the Private Information of Plaintiff and the Class from being vulnerable to cyberattacks, including by encrypting documents containing Private Information, by not permitting documents containing unencrypted Private Information to be maintained on its systems, and other similarly common-sense precautions when dealing with sensitive Private Information. Additional duties that Young Consulting owed Plaintiff and the Class include:

a.   To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the Private Information in its possession;

b.   To protect the Private Information in its possession using reasonable and adequate security procedures and systems;

c.   To adequately and properly audit and test its systems;

d.   To adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and store Private Information;

e.   To train its employees not to store Private Information for longer than absolutely necessary;

f.   To implement processes to quickly detect a data breach, security incident, or intrusion; and

g.   To promptly notify Plaintiff and Class Members of any data breach, security incident, or intrusion that affected or may have affected their Private Information.

87.   Defendant's duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (the "FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the Federal Trade Commission, the unfair practices by

companies such as Defendant of failing to use reasonable measures to protect Private Information. Plaintiff and Class Members are consumers under the FTC Act. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and by not complying with industry standards. Accordingly, Defendant has committed negligence *per se* by violating the FTC Act.

88.    Various FTC publications and data security breach orders further form the basis of Defendant's duty.

89.    Plaintiff and the Class were the intended beneficiaries of Defendant's duties, creating a special relationship between them and Young Consulting. Defendant was in a position to ensure that its systems were sufficient to protect the Private Information that Plaintiff and the Class had entrusted to it.

90.    Defendant breached its duties of care by failing to adequately protect Plaintiff's and Class Members' Private Information.  Defendant breached its duties by, among other things:

   a.    Failing to exercise reasonable care in obtaining, retaining securing, safeguarding, deleting, and protecting the Private Information in its possession;

   b.    Failing to protect the Private Information in its possession using reasonable and adequate security procedures and systems;

c.    Failing to adequately and properly audit and test its computer systems to avoid cyberattacks;

d.    Failing to adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and store Private Information, including maintaining it in an encrypted format;

e.    Failing to consistently enforce security policies aimed at protecting Plaintiff and the Class's Private Information;

f.    Failing to implement processes to quickly detect data breaches, security incidents, or intrusions;

g.    Failing to abide by reasonable retention and destruction policies for Private Information it collects and stores; and

h.    Failing to promptly and accurately notify Plaintiff and Class Members of the Data Breach that affected their Private Information.

91.    Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

92.    As a proximate and foreseeable result of Defendant's grossly negligent conduct, Plaintiff and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

93.    The damages Plaintiff and the Class have suffered (as alleged above) were and are reasonably foreseeable.

94.    The damages Plaintiff and the Class have and will suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

95.    Plaintiff and the Class have suffered injury, including as described herein, and are entitled to actual and punitive damages in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
### BREACH OF CONTRACT, THIRD-PARTY BENEFICIARY
### (On Behalf Plaintiff and the Class)

96.    Plaintiff incorporates by reference all factual allegations in paragraphs 1-80 as though fully alleged here.

97.    Defendant entered into various written contracts with its clients to perform services that include, but are not limited to, risk management services.

98.    These contracts were made in part for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant and its clients. Indeed, Defendant knew that if it were to breach these contracts with its clients, the clients' customers—Plaintiff and Class Members—would be harmed.

99.   It was intended by Defendant and its clients at the time the contracts were made that Defendant would assume a direct obligation to protect Plaintiff's and the Class's Personal Information.

100.   It was also intended by Defendant and its clients that the performance under the contract would necessarily and directly benefit Plaintiff and the Class. Defendant would collect payment from Plaintiff and the Class and Defendant would expunge their debt in return.

101.   Defendant breached the contracts it entered into with its other clients by, among other things, failing to (i) use reasonable data security measures, and (ii) implement adequate protocols and employee training sufficient to protect Plaintiff's Personal Information from unauthorized disclosure to third parties.

102.   As foreseen, Plaintiff and the Class were harmed by Defendant's breach of its contracts with its clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

103.   Plaintiff and Class Members are also entitled to their costs and attorney's fees incurred in this action.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

104.   Plaintiff incorporates by reference all factual allegations in paragraphs 1-80 as though fully alleged here.

105.    Plaintiff asserts this Cause of Action as an alternative theory of recovery to the Second Cause of Action.

106.    Through the use of Plaintiff's and Class Members' Private Information, Defendant received monetary benefits, including profits.

107.    Defendant collected, maintained, and stored the Private Information of Plaintiff and Class Members and, as such, Defendant had direct knowledge of the monetary benefits conferred upon it by Plaintiff and Class Members.

108.    Defendant appreciated that a monetary benefit was being conferred upon it by Plaintiff and Class Members and accepted that monetary benefit.

109.    However, acceptance of the benefit under the facts and circumstances described herein make it inequitable for Defendant to retain that benefit without payment of the value thereof.  Specifically, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite data security.

110.   Under the principle of equity and good conscience, Defendant should not be permitted to retain the monetary benefit belonging to Plaintiff and Class Members because Defendant failed to implement the appropriate data management and security measures.

111.   Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

112.   If Plaintiff and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to allow Defendant to have or maintain their Private Information.

113.   As a direct and proximate result of Defendant's decision to profit rather than provide adequate data security, Plaintiff and Class members suffered and continue to suffer actual damages, including (i) the amount of the savings and costs Defendant reasonably should have expended on data security measures to secure Plaintiff's Private Information, (ii) time and expenses mitigating harms, (iii) diminished value of the Private Information, (iv) harms as a result of identity theft; and (v) an increased risk of future identity theft.

114.   Defendant, upon information and belief, has therefore engaged in opportunistic, unethical, and immoral conduct by profiting from conduct that it knew would create a significant and highly likely risk of substantial and certainly impending harm to Plaintiff and the Class in direct violation of Plaintiff's and Class

Members' legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendant to retain the benefits it derived as a consequence of its wrongful conduct.

115.    Accordingly, Plaintiff and the Class are entitled to relief in the form of restitution and disgorgement of all ill-gotten gains, which should be put into a common fund to be distributed to Plaintiff and the Class.

**FOURTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(On Behalf of all Plaintiffs and the Class)**

116.    Plaintiff incorporates by reference all preceding factual allegations in paragraphs 1-80 as though fully alleged here.

117.    This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

118.    Defendant owes duties of care to Plaintiff and Class Members that require Defendant to adequately secure their Private Information.

119.    Defendant still possesses Plaintiff's and Class Members' Private Information.

120.    Defendant does not specify in the Notice of Data Breach letters what steps it has taken to prevent a data breach from occurring again.

121.    Plaintiff and Class Members are at risk of harm due to the exposure of their Private Information and Defendant's failure to address the security failings that lead to such exposure.

122.    Plaintiff, therefore, seeks a declaration that (1) Defendant's existing security measures do not comply with its duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect customers' personal information, and (2) to comply with its duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

      i.      Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

     ii.     Engaging third-party security auditors and internal personnel to run automated security monitoring;

    iii.     Auditing, testing, and training their security personnel regarding any new or modified procedures;

    iv.     Segmenting their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

     v.     Conducting regular database scanning and security checks;

    vi.     Routinely and continually conducting internal training and education to inform internal security personnel how to identify

43

and contain a breach when it occurs and what to do in response to a breach;

vii.    Purchasing credit monitoring services for Plaintiff and Class Members for a period of ten years; and

viii.    Meaningfully educating Plaintiff and Class Members about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendant as follows:

a.    An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class;

b.    A judgment in favor of Plaintiff and the Class awarding them appropriate monetary relief, including compensatory damages, punitive damages, attorney fees, expenses, costs, and such other and further relief as is just and proper;

c.    An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.    An order requiring Defendant to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

e.    A judgment in favor of Plaintiff and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law; and

f.    An award of such other and further relief as this Court may deem just and proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this

Complaint.

Dated: September 3, 2024                    Respectfully submitted,


                                            */s/ Kristen Tullos Oliver*
                                            Kristen Tullos Oliver
                                            Georgia Bar No. 941093
                                            J. Cameron Tribble
                                            Georgia Bar No. 754759
                                            **THE BARNES LAW GROUP, LLC**
                                            31 Atlanta Street
                                            Marietta, GA 30060
                                            Telephone: 770-227-6375
                                            Facsimile: 770-227-6373
                                            Email: ktullos@barneslawgroup.com
                                            Email: ctribble@barneslawgroup.com


                                            A. Brooke Murphy*
                                            **MURPHY LAW FIRM**
                                            4116 Will Rogers Pkwy, Suite 700
                                            Oklahoma City, OK 73108
                                            Telephone: (405) 389-4989
                                            abm@murphylegalfirm.com

                                            *Pro Hac Petition forthcoming.

                                            *Counsel for Plaintiff and
                                            the Putative Class*